UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOLIDAY COMPANIES, HOLIDAY STATIONSTORES, INC., GANDER MOUNTAIN COMPANY, GMTN TALL TALES, LLC, OVERTON'S, INC. and CONSUMERS MARINE ELECTRONICS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> VISA, INC., VISA U.S.A., INC., VISA INTERNATIONAL SERVICE ASSOCIATION; MASTERCARD INCORPORATED, and MASTERCARD INTERNATIONAL INCORPORATED, <br><br> Defendants. | Case No. <br><br><br> **Jury Trial Demanded** |

## COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      NATURE OF ACTION ............................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................4

III.    PARTIES ..............................................................................................................5

     A.      Plaintiffs ................................................................................................5

     B.      Defendants ..............................................................................................6

IV.    CO-CONSPIRATORS ...........................................................................................7

V.     FACTUAL ALLEGATIONS ................................................................................8

     A.      The Role of Interchange Fees in Credit Card Transactions...................8

     B.      The Relevant Markets ...........................................................................13

         1.      The relevant geographic market.................................................13

         2.      The relevant product markets....................................................14

     C.      Defendants' Unlawful Combinations ...................................................15

         1.      Defendants rise to dominate the payment card industry............15

         2.      Defendants' combinations evolve.............................................16

         3.      Defendants attempt to evade antitrust liability by restructuring. ............................................................................17

             a.      MasterCard's IPO. ........................................................17

         4.      Defendants' current iterations remain unlawful combinations. ...........................................................................20

         5.      Market conditions during the relevant period contrast sharply with the past. ...............................................................21

     D.      Defendants' Market Power ...................................................................22

         1.      Visa's market power. ................................................................22

         2.      MasterCard's market power.......................................................23

010237-28  770504 V1

      3.      Further evidence of market power. ............................................................24

E.      Defendants' Anticompetitive Practices.......................................................25

      1.      Defendants fix interchange fees................................................................25

      2.      The Merchant Restraints. ..........................................................................25

           a.      The "Honor-All-Cards" Rules. ..................................................28

           b.      The "No-Multi-Issuer" Rules.....................................................29

           c.      The "All-Outlets" Rule. .............................................................29

           d.      The "No-Discount" Rule.............................................................30

           e.      The "No-Surcharge" Rule...........................................................30

F.      The Harmful Effects of Defendants' Unlawful Restraints ....................................31

G.      Legislation and Litigation Fail to Curtail Anticompetitive Conduct ....................33

VI.      CLAIMS FOR RELIEF ................................................................................34

COUNT I  VISA'S PER SE UNLAWFUL PRICE-FIXING OF
      INTERCHANGE  FEES FOR ACCEPTANCE OF CREDIT
      CARDS (SHERMAN ACT § 1) ................................................................34

COUNT II  MASTERCARD'S PER SE UNLAWFUL PRICE-FIXING
      OF INTERCHANGE  FEES FOR ACCEPTANCE OF CREDIT
      CARDS (SHERMAN ACT § 1) ................................................................36

COUNT III  VISA'S UNLAWFUL COMPETITIVE RESTRAINTS ON
      ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 1) ..........................38

COUNT IV  MASTERCARD'S UNLAWFUL COMPETITIVE
      RESTRAINTS ON  ACCEPTANCE OF CREDIT CARDS
      (SHERMAN ACT § 1) ...........................................................................40

COUNT V  VISA'S MONOPOLIZATION OF THE MARKET FOR
      ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 2) ..........................41

COUNT VI  MASTERCARD'S MONOPOLIZATION OF THE
      MARKET FOR  ACCEPTANCE OF CREDIT CARDS
      (SHERMAN ACT § 2) ...........................................................................42

COUNT VII  VISA'S ATTEMPTED MONOPOLIZATION (SHERMAN
      ACT § 2) ................................................................................................43

010237-28  770504 V1

COUNT VIII  MASTERCARD'S ATTEMPTED MONOPOLIZATION
(SHERMAN ACT § 2) ............................................................................44

COUNT IX  VISA'S VIOLATIONS OF STATE ANTITRUST AND
UNFAIR COMPETITION LAWS ........................................................45

COUNT 10  MASTERCARD'S VIOLATIONS OF STATE ANTITRUST
AND UNFAIR COMPETITION LAWS ...............................................48

DEMAND FOR JURY TRIAL ............................................................................50

PRAYER FOR RELIEF ......................................................................................50

010237-28  770504 V1

For their Complaint against Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, MasterCard Incorporated, and MasterCard International Incorporated, Plaintiffs allege as follows:

## I.        NATURE OF ACTION

1.        Plaintiffs bring this action against Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa") and MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard") seeking damages and injunctive relief for violations of federal and state antitrust laws. Visa and MasterCard, which operate the two dominant credit card networks in the United States, have each created and managed for years a horizontal combination and conspiracy in violation of section 1 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 1, and various state antitrust and unfair competition laws.

2.        Aided by their substantially similar conspiracies, Visa and MasterCard have each also acquired, maintained and abused monopoly power in the relevant markets, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and state antitrust and unfair competition laws.

3.        The membership of each combination comprises the vast majority of banks and other financial institutions (collectively "member banks" or "banks") that issue credit and debit cards (collectively "payment cards" or "cards") in the United States. Nearly all of the banks that are members of Visa's combination also belong to MasterCard's combination and issue both Visa and MasterCard payment cards.

4.        For nearly a decade, Defendants' combinations fixed interchange fees (also known as swipe fees) at an exorbitant price that Plaintiffs and other retail merchants must pay member banks for the privilege of accepting a Visa-branded payment card ("Visa payment card" or "Visa card") or MasterCard-branded payment card ("MasterCard payment card" or

- 1 -

"MasterCard card"). With the complicity of their co-conspirator member banks, Defendants have set interchange fees far in excess of competitive levels. The member banks have surrendered their economic autonomy to Defendants' combinations, choosing to abide by the interchange fees fixed by Visa and MasterCard rather than vie for merchant acceptance by offering competitive interchange fees.

5.      This collusive activity contrasts conspicuously with the member banks' robust competition for cardholders. By offering a dizzying array of low introductory interest rates, points and cash-back rewards, travel services, purchase protection and other enticements, the banks compete vigorously to *issue* payment cards to consumers and to reap the revenue streams flowing from use of the cards.

6.      The very same banks have been loath to compete with one another for the *acceptance* of payment cards by merchants. The reason is simple: by making a conscious commitment to ally with Visa and MasterCard in a common scheme to fix interchange fees at supracompetitive levels, the banks have been assured of generating far more interchange fee revenue than honest competition ever could.

7.      Defendants have established what they misleadingly call "default" interchange fees. Contrary to that term's connotation that the fees may deviate from "default" levels, however, each of the Defendants' combinations has effectively frozen the "default" rates by means of adopting and enforcing a regimen of rules and regulations referred to here as the Visa Merchant Restraints and the MasterCard Merchant Restraints (collectively, the "Merchant Restraints").

8.      Devised by Defendants, embraced by their member banks, and imposed on merchants accepting Visa and MasterCard payment cards, the Merchants Restraints are

- 2 -

horizontal agreements that have eradicated competition among the member banks for merchant acceptance of their cards. They have also shielded the combinations against serious competition from other payment card networks.

9.      Fettered by the anticompetitive Merchant Restraints, Plaintiffs and other merchants have been unable to develop and employ rational strategies to spur lower interchange rates. But for these restrictions, Plaintiffs could have used reasonable measures such as adding a surcharge on the use of payment cards carrying higher interchange fees, giving customers a discount for using cards with lower interchange fees, and negotiating with individual issuing banks for lower interchange fees. In a truly competitive market, Defendants' issuing banks would have responded by dropping their interchange rates to avoid losing merchants to other banks.

10.     As it is, however, Plaintiffs' hands have been tied. They have no say in setting interchange fees, which is solely an arrangement between issuing banks and acquiring banks, which have had no incentive to negotiate competitive interchange fees. Nor do merchants have any power to influence customers' choices at the point of sale, trapping them in the web built by Defendants and their member banks. Because deciding not to accept Visa and MasterCard payment cards would sound a death knell for their businesses, Plaintiffs and other merchants have been held captive by Defendants' cartels.

11.     Visa and MasterCard have successfully suppressed competition in the relevant markets because of the enormous market power they wield, individually and collectively. On behalf of their member banks, Defendants have deliberately exploited their market power to prevent others from entering and competing in the relevant markets.

- 3 -

12.     By abusing their market power, Defendants have insulated themselves and their members from competition that would drive down the bloated prices Plaintiffs have paid to accept Visa and MasterCard payment cards. There is no competitive justification for the excessive interchange fees; Defendants' combinations have fixed them far in excess of the associated network and bank costs.

13.     Plaintiffs have each been injured as a direct result of Defendants' anticompetitive conduct, and accordingly seek damages from January 1, 2004, through at least November 27, 2012, or until such time as Defendants' illegal conduct and its effects have ceased (the "Relevant Time Period"). Unless otherwise specified or implied by context, all allegations in this Complaint relate to conduct and effects during the Relevant Time Period.

14.     In addition, Plaintiffs seek injunctive relief to the extent that Defendants have not halted their illegal conduct, either pursuant to the class action settlement (the "Class Settlement") in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, Case No. 05-MDL-1720 (the "*Interchange Fee MDL*"), or otherwise.

## II.     JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction over Plaintiffs' claims under sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2) by virtue of 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (commerce and antitrust regulation), and sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26). The Court has supplemental jurisdiction over Plaintiffs' state antitrust and unfair competition claims under 28 U.S.C. § 1367.

16.     16.     Venue is proper in this Court under sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 1391(a) and (b), as Defendants reside in, are found in, have agents in, and transact business in this District.

- 4 -

### III.   PARTIES

**A.   Plaintiffs**

17.     Plaintiff Holiday Companies, a Minnesota corporation, has its principal place of business in Bloomington, Minnesota.

18.     Plaintiff Holiday Stationstores, Inc., a Minnesota corporation, is a wholly-owned subsidiary of Plaintiff Holiday Companies, and has its principal place of business in Bloomington, Minnesota.

19.     Plaintiffs Holiday Companies and Holiday Stationstores, Inc. own and operate more than 500 fuel and conveniences stores known as Holiday® and Holiday Stationstores® in Minnesota, Wisconsin, Michigan, North Dakota, South Dakota, Montana, Wyoming, Idaho, Washington and Alaska, and accept Visa and MasterCard payment cards as payment for fuel, merchandise, car washes and other services.

20.     Gander Mountain Company ("Gander Mountain") is a Minnesota corporation having its principal place of business in St. Paul, Minnesota. It owns and operates more than 150 outdoor lifestyle stores in twenty-six states, primarily in the Midwestern, Southeastern and South-Central United States, and accepts Visa and MasterCard payment cards as payment for merchandise and services.

21.     GMTN Tall Tales, LLC, a wholly owned subsidiary of Gander Mountain, is a Florida limited liability company having its principal place of business in Palm Beach Gardens, Florida. It owns and operates a restaurant in Palm Beach Gardens, where it accepts Visa and MasterCard payment cards as payment for food and services.

22.     Overton's, Inc. ("Overton's"), a wholly owned subsidiary of Gander Mountain since December 2007, is a North Carolina corporation having its principal place of business in Greenville, North Carolina. Overton's owns and operates boating and watersports stores in North

Carolina and sells boating and watersports merchandise across the United States through its catalog and Internet marketing operations, and accepts Visa and MasterCard payment cards as payment for merchandise and services.

23.     Consumers Marine Electronics, Inc., a wholly owned subsidiary of Overton's, is a New Jersey corporation having its principal place of business in Greenville, North Carolina. Until 2009, it owned and operated a marine electronics store in Wall, New Jersey, where it accepted Visa and MasterCard payment cards as payment for merchandise and services.

24.     By accepting Visa and MasterCard payment cards, each of the Plaintiffs has been compelled to pay supracompetitive, artificially inflated interchange fees in the United States to members of each Defendant's horizontal conspiracy. As a direct result, each of the Plaintiffs has sustained injury to its business and property and is threatened with further injury to the extent Defendants have not ceased their illegal conduct, either pursuant to the Class Settlement or otherwise.

25.     Each of the Plaintiffs has timely and properly elected to exclude itself from the Rule 23(b)(3) settlement class in the *Interchange Fee MDL*. Their claims in this action for damages are therefore not subject to any release in that litigation.

**B.     Defendants**

26.     Before the initial public offering and corporate restructuring described below, Defendant Visa International Service Association ("Visa International") was a non-stock Delaware membership corporation with its principal place of business in Foster City, California. It operated as a national bank-card association whose members included approximately 14,000 banks.

27.     One of Visa International's members was Defendant Visa U.S.A. Inc., a non-stock Delaware corporation having its principal place of business in San Francisco, California.

- 6 -

Visa U.S.A. Inc.'s members were the issuing banks and acquiring banks participating in the Visa payment card system. Until Visa's corporate re-structuring, Visa U.S.A. Inc. was governed by a board of directors comprising bank executives selected from its member banks.

28.     Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Created through a corporate reorganization in or around October 2007, its initial shareholders were Visa U.S.A. Inc.'s member banks.

29.     Defendant MasterCard Incorporated, formed in 2001, is a Delaware stock corporation having its principal place of business in Purchase, New York.

30.     Defendant MasterCard International Incorporated, formed in 1996, is a Delaware non-stock membership corporation having its principal place of business in Purchase, New York. Its principal or affiliate members are issuing and acquiring banks participating in the MasterCard payment card system. Before the MasterCard initial public offering described below, it was the principal operating subsidiary of MasterCard Incorporated.

## IV.     CO-CONSPIRATORS

31.     Co-conspirators participating in Defendants' combinations and collusive schemes include: (a) the thousands of member banks that have issued Visa or MasterCard payment cards or have acquired Visa or MasterCard transactions from merchants, or both, and have knowingly participated in one or both conspiracies to set, fix and enforce interchange fees by means including the Merchant Restraints and to impose the Merchant Restraints upon retail merchants; and (b) the member banks that are or were members of the boards of directors of Visa or MasterCard and have agreed to impose, and have imposed, the Merchant Restraints upon retailers.

32.     These banks have participated in Defendants' conspiracies both before and after their corporate restructurings. Before the restructurings, they agreed to, and did, comply with

- 7 -

Defendants' bylaws, rules and regulations, which underpinned their agreement among themselves and with Defendants to fix and enforce interchange fees and impose the Merchant Restraints on Plaintiffs and other merchants. During that time Defendants' boards of directors were composed of executives from member banks, who participated in that capacity in the concerted fixing of interchange fees and the adoption and enforcement of the Merchant Restraints.

33.     After Defendants' restructurings, the member banks continued to participate in Defendants' unlawful combinations. To effectuate the conspiracies, the Merchant Restraints were incorporated into every contract between a member bank and a merchant, thus assuring that the interchange fees adopted by Visa and MasterCard would be paid by merchants for all transactions using their payment cards. In this way, each member bank has known that the others were implementing and enforcing the same fee schedules and Merchant Restraints.

## V.     FACTUAL ALLEGATIONS

**A.     The Role of Interchange Fees in Credit Card Transactions**

34.     Visa and MasterCard do not issue payment cards. Instead, they provide their member banks with payment products carrying the Visa and MasterCard brands. The banks then offer Visa- and MasterCard-branded payment cards to consumers to garner the coveted purchase volumes generated by the cards.

35.     Credit cards enable the cardholder to purchase goods or services from a merchant on credit provided by the bank that issued the card. On behalf of the cardholder, the issuing bank pays the merchant for the goods or services purchased with the card and is then repaid by the cardholder according to the terms of a revolving-credit agreement between the cardholder and the issuer.

- 8 -

36.     Credit cards can be classified into two main categories. A general purpose (or universal) credit card, which is the type of credit card at issue in this action, allows the cardholder to obtain goods, services or cash on credit extended by issuing banks that are members of a card network such as Visa's or MasterCard's. This type of credit card can be used with any merchant that accepts it. General purpose credit cards are distinguished from private label credit cards, not at issue in this action, which are specific to a particular merchant.

37.     General purpose credit cards come in three main varieties:

a.     Charge cards, which allow the cardholder to obtain goods or services on credit but require the full balance to be paid each billing cycle;

b.     Standard (or traditional) credit cards, which deliver few, if any, benefits to their holders in addition to credit extension; and

c.     Rewards, or loyalty, cards, which provide cash-back rebates and airline miles or points that can be redeemed for travel and other merchandise and services. Over time, new species of rewards cards have emerged, offering ever-increasing benefits. The card industry has been inundated by premium credit card products and their more upscale cousins, ultra-premium (or premium plus) cards, which offer a panoply of featured benefits, including travel insurance and services, purchase protection, cash-back rebates and airline miles or points that can be redeemed for travel and other merchandise and services. As the court found in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 334 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) (hereinafter "*Visa U.S.A.*"), cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency

- 9 -

medical services and purchase security/extended protection programs." The choices are even more diverse today.

38.     Visa and MasterCard prescribe so-called "default" interchange fees that merchants are required to pay the issuing banks for every purchase on a Visa or MasterCard payment card. They have each devised complex interchange fee schedules that provide for different rate classifications based on the merchant's type of business, sales volume, and the level of benefits bundled with the customer's card. The interchange fee is typically a percentage of the purchase amount plus a small, flat per-transaction amount.

39.     The interchange fee schedules are incorporated into the agreements between Visa and MasterCard and their respective member banks, dictating the interchange fees to be assessed. The payment of interchange and other rules imposed by Visa and MasterCard are enforced by the member banks through terms in their agreements with merchants. The Visa and MasterCard network rules binding merchants provide that all card transactions will occur at the "default" interchange fee rate set by the network. Because issuing banks receive at least the "default" rate if they do not negotiate a lower interchange fee rate with merchants, there is no financial incentive for them to agree to a lower rate.

40.     Acquiring banks ensure that card transactions are routed over the Visa and MasterCard networks, that interchange fees set by Visa and MasterCard are paid on all transactions, and that merchants abide by the rules imposed by Visa and MasterCard. Just as issuers compete horizontally for cardholders, acquirers compete horizontally with one another to acquire the transaction business of merchants.

41.     To accomplish payment card transactions, member banks have delegated to the Visa and MasterCard networks the role of providing processing services. These services, known

- 10 -

as "network services," include authorization, clearance and settlement of retail purchase transactions. Although Visa and MasterCard ostensibly compete horizontally with each other to provide network services to retail merchants and cardholders, their restrictive rules and practices have substantially and unreasonably restrained competition between them. In particular, they eliminate virtually all horizontal price competition between Defendants for the use of their respective credit cards at the point of sale.

42.     In the formative years of payment card networks, merchants used paper forms to record and process transactions. Merchants sent these documents to their acquiring banks, which manually processed and transferred them to the issuing banks. At least one court has found that interchange fees were instituted to defray these manual processing and transferring costs. *See National Bancard Corp. v. Visa U.S.A. Inc.*, 596 F. Supp. 1231, 1238 (S.D. Fla. 1984).

43.     Even if interchange fees were initially necessary to pay the expense of processing and transferring paper, they were no longer justified during the Relevant Time Period. As technology developed, the actual transactional costs to payment card networks fell significantly. By 2004, virtually all payment card transactions were processed electronically and authorized almost instantly. As a result, networks operated far more efficiently, reducing transaction costs while increasing transaction volume.

44.     Plaintiffs and other merchants have never benefitted from these cost savings. To the contrary, Defendants hiked interchange fees after automation was introduced. These interchange fees were unrelated to actual network operating expenses. By 2004, interchange fees were the member banks' most profitable banking service.

45.     Defendants have proffered other inadequate justifications for interchange fees. In the early 1980s they claimed that the fees were necessary to develop their fledgling networks by

- 11 -

inducing banks to issue payment cards and recruiting merchants to accept them. Whatever merit this explanation might once have had, it vanished long before the Relevant Time Period, as a mature payment card market became saturated by Visa and MasterCard payment cards and Defendants' networks attracted legions of merchants who could no longer remain viable without accepting the cards.

46.     More recently, Defendants have contended that interchange fees are necessary to pay the costs of fraud prevention and protection. Again, this rationale falls far short of legitimizing the swollen interchange fees Plaintiffs have been forced to pay. There is no demonstrable correlation between fraud costs and interchange fees.

47.     On the other hand, there is a correlation between the growth of premium cards and the growth of interchange fees. To exact even more revenue from Plaintiffs and other merchants through the exercise of unrelenting market power, Defendants and their co-conspirator banks have introduced a number of pricing tiers for different classes of payment cards. Aided by the Merchant Restraints, Defendants have coercively charged most merchant categories higher interchange fees for premium credit cards than those charged on standard credit card transactions. They have done so to finance the benefits bundled with premium cards. The nexus between premium card benefits and interchange fees is evident in the financial statements of some card issuers, which account for the cost of rewards programs as reductions in interchange income.

48.     Although merchants effectively fund rewards programs of issuing and acquiring banks, they derive no benefit from them. Rather than generating additional sales, which would benefit merchants, rewards programs merely induce consumers to shift from less expensive

payment cards to the more expensive ones. Plaintiffs and other merchants are powerless to resist the higher interchange fees foisted on them.

49.     Not surprisingly given the higher profits for Defendants and their member banks, the number of rewards cards in circulation has soared. The influx of premium cards has crushed merchants under the weight of interchange fee growth. Rewards cards rose from less than 25 percent of new card offers in 2001 to nearly 60 percent in 2005. In 2002, approximately 15 percent of Visa credit cards issued in the United States were premium credit cards. By 2010, more than 40 percent of the Visa and MasterCard credit cards issued in the United States were premium cards.

50.     Nor have interchange fees produced any efficiencies to justify their size. They have been far higher than necessary for Defendants' networks to function efficiently, to set standards for payment card transactions, or to promote the business of Visa and MasterCard. There are similar networks that function very efficiently without collectively set interchange fees. Checks are one obvious example. The truth is that the interchange fees charged in Defendants' mature networks have had only one purpose: they were implemented by Defendants in concert with their member banks as a means of reaping supracompetitive revenue. Had market forces rather than collusive action determined interchange fees, they would have been substantially lower.

**B.     The Relevant Markets**

**1.     The relevant geographic market.**

51.     The relevant geographic market is the United States and its territories (collectively, "the United States").

52.     Visa and MasterCard have set interchange fees and implemented the Merchant Restraints on a national basis, and these restrictions are specific to the United States. Together

- 13 -

with their largest issuing banks, Visa and MasterCard advertise nationally and pursue promotional strategies directed at the entire United States.

53.     Plaintiffs and other merchants accept payment cards from consumers across the United States. The Merchant Restraints require merchants to accept the cards of all member issuing banks at all of their outlets throughout the United States.

### 2.     The relevant product markets

54.     There are at least three relevant product markets in which Defendants' unlawful conduct has had an anticompetitive effect:

a.     Network services for general purpose credit cards. *See United States v. Visa and MasterCard*, 344 F.3d 229, 239 (2d Cir. 2003);

b.     Network services for Visa credit cards; and

c.     Network services for MasterCard credit cards.

55.     Unless otherwise specified, the term "relevant market," as used herein, means the relevant product market alleged in subparagraph 51(a) or, alternatively, the relevant product markets alleged in subparagraphs 51(b) and (c).

56.     The Court found in *Interchange Fee MDL* that MasterCard possesses monopoly power in the market for network services for general purpose credit cards and that there is a market for network services for MasterCard credit cards.

57.     In the relevant market, the sellers are payment card networks and their member banks, and the buyers are retail merchants. The interchange fee is the price paid directly by merchants to receive payment for a credit card transaction. Retail merchants directly pay billions of dollars a year to purchase network services sold by sellers in the relevant market, and this amount is increasing rapidly from year to year.

- 14 -

58.     A seller with market power over network services for general purpose credit cards in the United States can raise interchange fees to merchants substantially above the competitive level without losing enough business to make the price increase unprofitable. Merchants cannot substitute other payment methods because general purpose credit cards enjoy a high degree of preference among their customers. Other payment methods are not close substitutes for general purpose credit cards in the eyes of merchants, who will not stop accepting general purpose credit cards if they experience a non-transitory price increase in interchange fees.

59.     At all relevant times, Visa and MasterCard have each had substantial market power in the relevant market, as demonstrated by their ability to (1) raise interchange fees without losing business to other sellers or payment methods, (2) discriminate in price among different classes of merchants, and (3) shift credit card usage from standard cards to premium cards, which carry even higher and faster growing interchange fees, without losing any transactional volume.

60.     There are significant barriers to entry in the relevant markets. No company has successfully entered the markets since 1985. Entry is estimated to cost more than one billion dollars to overcome the so-called "chicken-and-egg" problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place.

## C.     Defendants' Unlawful Combinations

### 1.     Defendants rise to dominate the payment card industry.

61.     Before Visa and MasterCard existed, national credit cards were available only from American Express, Diner's Club and Carte Blanche. These were charge cards accepted by only a relatively small number of merchants.

62.     Banks began associating in the 1960s to form networks that offered national credit cards issued by multiple banks. From these simple beginnings emerged two dominant networks: BankAmericard, Visa's predecessor, and InterBank, MasterCard's forerunner. From their creations until their respective IPOs four decades later, Visa and MasterCard were member-owned and member-governed associations of banks.

63.     Defendants' precursors began as regional associations of member banks, but their networks soon expanded to a national scope. Use of their payment cards concomitantly soared. While only 16 percent of U.S. households owned a payment card in 1970, by 2010 that number had increased to 80 percent. By that time, 269 million Visa credit cards and 171 million MasterCard credit cards were circulating across the country. Visa and MasterCard continued to grow as they evolved into global joint ventures having more than 21,000 and 23,000 member banks, respectively.

64.     Defendants' growth has commanded dominant market shares in the U.S. payment card industry. In 2010, for example, the total volume of merchant sales on payment cards was $3.258 trillion. Of that amount, $2.674.9 trillion, or about 82 percent, was transacted on Visa and MasterCard payment cards.

65.     Defendants have achieved universal penetration of their credit cards into the relevant markets, and their networks dwarf all others. American Express, the next-largest network, had fewer than 49 million credit cards circulating in 2010. Since Defendants' networks were created, only one competitor has entered the national payment card industry: the Discover Card, introduced in 1985 by Sears, then the nation's largest retailer.

**2.     Defendants' combinations evolve.**

66.     Until recently, Visa and MasterCard were organized as joint ventures of their member banks. As members of these joint ventures, the banks welcomed the "default"

- 16 -

interchange fees and agreed to adopt and enforce the Merchant Restraints. By imposing the Merchant Restraints on all merchants accepting Visa and MasterCard payment cards, Defendants insulated the interchange fees from competition, ensuring by fiat that they would remain fixed at above-market levels.

67.     Defendants' combinations were more than mere joint ventures. Each was a consortium in which the interests and purposes of the participants were merged into one collective entity. This union of purpose and action was facilitated by the composition of Defendants' boards of directors. The majority of their board members were executives of their member banks. It was these interlocking directorates that pegged interchange fees and adopted mutually advantageous bylaws and rules to achieve the common purpose of solidifying Defendants' market power.

68.     The conspiratorial nature of Defendants' networks was recognized by the Second Circuit in *U.S. v. Visa*, where it held that the combinations operated as illegal consortiums and that their unifying rules and bylaws were unlawful horizontal agreements to restrain trade.

### 3.     Defendants attempt to evade antitrust liability by restructuring.

69.     After being adjudged "constructive conspiracies" by courts in the United States, Europe and Australia, Visa and MasterCard restructured themselves in a patent effort to escape antitrust liability. Guised as IPOs, the reorganizations preserved the essential conspiratorial elements of Defendants' combinations.

### a.     MasterCard's IPO.

70.     On May 25, 2006, MasterCard conducted an IPO whereby it sold shares to public investors, and redeemed and reclassified shares previously held by its member banks. These shares were classified as "Class A" shares, with full voting rights, and represented a 41 percent equity interest in MasterCard. The member banks received both "Class B" shares, which

- 17 -

constituted a 49 percent equity interest in MasterCard and had no voting rights, and "Class M" shares, which had no voting rights with respect to day-to-day operations but did give the member banks veto power over major MasterCard transactions and corporate decisions. The remaining 10 percent equity interest in MasterCard was vested in the newly created MasterCard Foundation.

71.     Before its IPO and as part of the transaction itself, MasterCard and its member banks executed several agreements ensuring that the banks would retain significant control over MasterCard's corporate and competitive decisions. For example, MasterCard and its member banks enacted a restriction that prohibited any one shareholder or group of shareholders from acquiring more than a 15 percent equity interest in MasterCard. This restriction prevented any investors from acquiring a controlling stake in MasterCard to compete with Visa by offering lower interchange fees.

72.     In addition, the member banks' Class M shares gave them the right to block, among other things, (a) the sale of all, or substantially all, of MasterCard's assets; (b) any merger or consolidation of MasterCard; and (c) the exit by MasterCard from its "core payments business." These rights, especially the right to prevent MasterCard from leaving its core payments business, allowed the member banks to sustain their inflated interchange fees.

**b.     Visa's IPO.**

73.     On March 19, 2008, Visa followed MasterCard's lead by conducting its own IPO. As part of that transaction, Visa U.S.A., Visa International, Visa Canada, and Inovant became subsidiaries of a newly created publicly traded corporation called Visa Inc. The new entity offered 406 million shares of "Class A" common stock to public investors. It also redeemed and reclassified approximately 270 million shares of Visa previously held by the member banks into "Class B" and "Class C" shares. Ownership of these shares was based on geographic location.

- 18 -

Members of Visa U.S.A. acquired Class B shares, while members of Visa Canada, Visa Europe and three other unincorporated geographic regions of Visa International acquired Class C shares.

74.     The voting rights accompanying Visa Inc.'s shares mirrored MasterCard's maneuvers. The Class A shares had voting rights, while the member banks' Class B and Class C shares did not. As was the case with MasterCard, however, Visa's pseudo-metamorphosis ensured that its member banks retained significant control over its corporate and competitive decisions.

75.     For example, absent approval by Visa's board of directors, no individual entity could own more than 15 percent of the Class A stock. Just as MasterCard had, Visa thus precluded any investors from acquiring a controlling interest in Visa and deciding to compete with MasterCard with lower interchange fees. Also echoing the MasterCard restructuring, the member banks' Class B and Class C stock had voting rights with respect to certain extraordinary transactions, such as a consolidation or merger, or a decision to exit the "core payments business." Any such transaction required approval by 80 percent of the voting shares, giving the member banks veto power to prevent the sale of Visa or a change in its core business.

76.     Visa and MasterCard attempted to use their IPOs as vehicles for transforming themselves into single entities incapable of conspiring within the meaning of section 1 of the Sherman Act. Defendants' intent to shield themselves from antitrust scrutiny is evident in the dual-class voting structures they devised. Visa's intent to shield itself is further evidenced by its emulation of MasterCard's machinations and by the fact that it conducted its IPO during the pendency of antitrust litigation against Defendants in this Court.

77.     Defendants' own public statements underscored the transparent impetus for their restructuring. Visa and MasterCard were both motivated by a desire to mask the reality that their

- 19 -

member banks retained control. For example, the prospectus for MasterCard's IPO stated that "heightened regulatory scrutiny and legal challenges" motivated its reorganization. MasterCard admitted that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers – or member financial institutions – own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

### 4. Defendants' current iterations remain unlawful combinations.

78. Given Defendants' underlying purpose for altering their corporate forms, it is not surprising that their IPOs did not abate the illegal conduct of their combinations. The Merchant Restraints survived intact to continue squelching competition in the relevant market. The Merchant Restraints continued to forestall the development of truly competitive markets. The end result was two parallel networks enabling Visa and MasterCard to place anticompetitive tariffs on the relevant market.

79. The fact that thousands of banks belong to Defendants' combinations did not limit their motivation and ability to participate as co-conspirators. As the Second Circuit held in *U.S. v. Visa*, with respect to the member banks' collusive adoption and enforcement of rules forbidding the issuance of American Express and Discover cards, "these 20,000 [member] banks have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of Amex or Discover. The restrictive provision is a horizontal restraint adopted by 20,000 competitors."

80. Neither Visa, MasterCard nor any of their member banks took any affirmative action to withdraw from the combinations, either as part of the IPOs or otherwise. Quite to the contrary, since the IPOs the member banks of Visa and MasterCard have persisted in accepting

and enforcing the Merchant Restraints to suppress competition in the relevant market, and Visa and MasterCard have continued to set "default" interchange fees for the benefit of their issuing bank members.

81.     The member banks have remained separate entities situated horizontally in the relevant market. Instead of competing for merchant acceptance, however, they have perpetuated the Merchant Restraints by remaining parties to written agreements with Defendants that controlled the combinations. These agreements explicitly provided that the very same Merchant Restraints implemented before Defendants' IPOs – when the member banks sat on Defendants' boards and courts adjudged the networks to be structural conspiracies – survived Defendants' reorganizations. The agreements expressly mandated adherence to the Merchant Restraints.

82.     Just as each member bank was aware before the IPOs that the other banks were parties to the same agreements, they remained keenly aware of that concerted action. From their positions at the center of their respective combinations, Defendants – just as they did before their IPOs – facilitated and coordinated the conspiracies to fix and maintain excessive interchange fees.

### 5.     Market conditions during the relevant period contrast sharply with the past.

83.     The payment card markets today are saturated and characterized by concentration of both issuing and acquiring banks and by decreasing transactional costs. These are vastly different economic characteristics from those existing in the early 1980s, during the last adjudicated challenge to collective price-setting by member banks before the *Interchange Fee MDL. See National Bancard Corp. v. Visa U.S.A. Inc.*, 779 F.2d 592 (11th Cir. 1986). A comparison of market characteristics in or about 2004 and those in the early 1980s illustrates how radically different in every important economic respect today's payment card markets are from their early years.

- 21 -

84.     In the early 1980s, about 16 percent of consumers had payment cards. In 2004, that figure had swelled to about 78 percent. In 2004 issuing banks sent out over five billion mail solicitations annually to maintain a cardholder growth of 2.7 million per year, roughly equivalent to population growth in the United States. By July 2013, Visa alone had 2.2 billion cards in circulation.

85.     In the early 1980s, there were roughly $8 billion of transactions using general purpose credit cards. By 2004, the amount had increased to about $1.7 trillion. That year the interchange fees collected by Visa and MasterCard member banks totaled $26 billion.

86.     In 2012, payment cards generated $4.409 trillion in payments for goods and services in the U.S. and merchants paid $66.51 billion in fees on those sales. Merchants paid $69.81 billion the previous year on $4.105 trillion in purchase volume.

87.     In the early 1980s, interstate banking was in its infancy. Not long before, it had been prohibited. The walls formed by state boundaries had provided a primary impetus for the creation of interstate bank associations. By 2004 interstate banking was the norm. In the early 1980s, the top 10 card issuing banks issued only about 35 percent of the cards issued. By 2004 the top 10 issued approximately 82 percent of payment cards, and the top 25 issued about 98 percent. Since then, the trend toward consolidation has continued apace.

**D.     Defendants' Market Power**

88.     Visa and MasterCard have dominated the relevant market since their inceptions.

**1.     Visa's market power.**

89.     Visa and its issuing banks have collectively had market power in the relevant market. In *Visa U.S.A.*, the court found that Visa had a 47 percent share of the dollar volume of credit card transactions nationwide. In 2003, in *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), this Court reaffirmed that Visa had

- 22 -

market power in the relevant market based on a finding that its market share fluctuated between 43 percent and 47 percent, coupled with a finding that substantial barriers to entry existed in the market. Visa's share of the market has not changed significantly since these two holdings.

90.     Visa's conduct is further evidence of its own market power and that of its member banks. After its IPO, Visa established interchange fees on behalf of its issuing banks. Visa continued to enforce the Merchant Restraints, which prevented competition among its issuing banks. Absent the Merchant Restraints, Visa's issuing banks would have competed as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would have been beneficiaries of that competition.

91.     Visa's market power is further demonstrated by its ability to discriminate in price between different types of merchants by distinguishing them according to size, transactions by size, card type and retail category. Visa sets pricing tiers for different types of merchants and has established different rates for standard and general purpose credit cards. Visa's recent interchange fee schedules specify more than 70 different credit card interchange rates.

## 2.     MasterCard's market power.

92.     MasterCard and its issuing banks have also jointly possessed market power in the relevant market. In *Visa U.S.A.*, the court held that MasterCard's 26 percent share of credit card dollar volume was sufficient to evidence market power. In *Visa Check*, the court similarly held that MasterCard's 26-28 percent market share was enough to present a jury question as to MasterCard's market power. Further, a 2008 decision in the *Interchange Fee MDL* sustained allegations that MasterCard's roughly 30 percent market share, along with evidence of entry barriers and other market factors, supported a finding of monopoly power in the market. MasterCard's share of the market has not changed significantly since those decisions.

93. MasterCard's conduct is direct evidence of its market power and that of its issuing banks. After its IPO, MasterCard established interchange fees on behalf of its issuing banks. MasterCard continued to enforce the Merchant Restraints, first promulgated by its member banks in the pre-IPO period, which prevented competition among its issuing banks for merchant acceptance.

94. MasterCard's market power is further demonstrated by its ability to discriminate in price between different types of merchants by distinguishing them according to size, transactions by size, card type and retail category. MasterCard sets pricing tiers for different types of merchants and has typically established different rates for general purpose and premium credit cards. MasterCard's recent interchange fee schedules specify more than 60 different credit card interchange rates.

**3. Further evidence of market power.**

95. There are significant barriers to entry into the market for credit cards. Indeed, the court in *Visa U.S.A.* specifically found that there are high barriers to entry into the credit card market. 163 F. Supp. 2d at 341. Visa's former CEO himself described starting a new card network as a "monumental" task involving an investment of more than $1 billion. Both AT&T and Citibank considered starting a competing credit card network but decided it would be an unprofitable venture, in great part because of the market power that Visa and MasterCard possess.

96. The enormous obstacles facing any potential entrant into the market are demonstrated by the fact that no company has entered since Discover did in 1985. Discover's entry further evidences Defendants' market power. Despite aggressive promotional efforts, Discover has never achieved more than a 7 percent share of the credit card market, and its current share is approximately 5 percent.

- 24 -

97.     The limited competition between Visa and MasterCard has not diminished either's power in the U.S. market for merchant acceptance of credit cards. With the collaboration of their member banks, Defendants have managed to raise total interchange fees on Visa and MasterCard card transactions at a rate faster than increases in retail sales.

98.     Defendants' "default" credit interchange fees further demonstrate their market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen. Despite these increases, merchants have not stopped accepting Visa and MasterCard credit cards.

## E.      Defendants' Anticompetitive Practices

### 1.      Defendants fix interchange fees.

99.     Defendants' ostensibly non-binding "default" interchange fee schedules are anything but. In setting interchange fees, Defendants have acted as the manager of their respective combinations, setting the price that merchants pay for card acceptance. As discussed next, the Merchant Restraints have effectively fixed interchange fees by removing any independent competition among issuing banks in setting the fees.

100.     Absent the Merchant Restraints, Plaintiffs would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks for merchant acceptance. In the markets controlled by Defendants' cartels, Visa and MasterCard, acting for their member banks, have established interchange fee schedules for the banks. Plaintiffs are among the merchants injured by this collective setting of interchange fees by Visa and MasterCard.

### 2.      The Merchant Restraints.

101.     To sustain interchange fees at supracompetitive levels, Visa and its member banks, and MasterCard and its member banks, have adopted and enforced the Merchant

- 25 -

Restraints to insulate their combinations from competition. In particular, the Merchant Restraints forbid Plaintiffs and other merchants from educating customers about the costs associated with different payment cards and steering their customers toward the least expensive payment cards.

102.    The Merchant Restraints are the linchpin of Defendants' conspiracies, suppressing both competition between the Visa and MasterCard networks and competition between member banks within each network. In particular, these rules have prevented competition among the issuing banks for transaction volume from merchants and effectively cemented into place the "default" interchange fees paid by merchants to issuing banks.

103.    The Visa Merchant Restraints are, for all practical purposes and effects, identical to the MasterCard Merchant Restraints. Both regimes have prevented customers from making fully informed decisions by forbidding merchants from choosing the terms upon which they will accept Defendants' payment cards. The Merchant Restraints have prohibited merchants from selectively accepting payment cards and from pricing goods and services according to the cost of payment. By preventing merchants from signaling to consumers the true costs of different payment methods, the Merchant Restraints have encouraged more card transactions at a higher price than would occur in an efficient market. They have enabled card issuers to externalize the costs of premium card benefits, shifting them to merchants and, ultimately, to consumers who do not use premium cards.

104.    The Merchant Restraints have no redeeming economic value. Proffered justifications are insufficient. One is that the restrictions are necessary to prevent merchants from accepting payment cards on inconsistent terms, which would make cards less desirable to consumers. This in turn, so the argument goes, would make card acceptance less desirable for merchants, causing a downward spiral to economic doom.

- 26 -

105.     The history of Defendants' networks and banking regulation refute this

contention. Defendants adopted the Merchant Restraints in response to branch banking

regulations and usury laws, not to ward off potential injury to card networks or consumers. These

laws have long been abolished. In any event, concerns about network dysfunction have no place

today, when firmly established payment card networks compete against other firmly established

networks. Any negative effect on one network would be offset by a positive effect on another

network, or on another payment system. The fact that payment card networks thrive elsewhere,

such as Europe and Australia, without the same arsenal of merchant restraints belies the claim of

network harm.

106.     The posited consumer protection rationale is also baseless given the modern

payment card environment. Concerns about inconsistent payment card acceptance arose, at least

in part, from past banking regulations that constrained interstate branch banking. Because banks

operated in only one state, there was a legitimate concern that merchants would not honor cards

issued by unfamiliar out-of-state banks. National banking flourished after those restrictions were

lifted, obviating the threat of inconsistent card acceptance and smoothing the way for

cardholders.

107.     The Merchant Restraints include the Honor-All-Cards Rules, the No Multi-Issuer

Rules, All-Outlets Rules, No-Discount Rules, and No-Surcharge Rules. The first three are

sometimes referred to as "anti-discrimination" rules, because they forbid merchants from picking

and choosing which cards they will accept within a card brand and for which transactions they

will accept cards. Within the Visa or MasterCard brand, card acceptance is an all-or-none

proposition, even though the costs to merchants of card acceptance vary enormously among

cards within a brand and by transaction size. The No-Discount Rules and No-Surcharge Rules

010237-28  770504 V1

are sometimes referred to as "anti-steering" rules, because they prohibited merchants from influencing their customers' decisions about what payment method to use.

a. **The "Honor-All-Cards" Rules.**

108.    The Honor-All-Cards Rules have required a merchant who accepts any Visa payment card to accept all Visa payment cards, and a merchant who accepts any MasterCard payment card to accept all MasterCard payment cards. These rules apply uniformly, regardless of card type or issuing bank. The purpose and effect have been to prevent merchants from refusing to accept Visa and MasterCard payment cards carrying higher interchange fees.

109.    Premium credit cards carry higher interchange fees than other cards to cover the additional costs of providing benefits, such as cash back or airline miles, to these cardholders. The Honor-All-Cards Rules have obligated merchants to accept Visa and MasterCard premium cards carrying higher interchange fees even though they provide no marginal benefit to merchants. Premium cards predictably enjoy greater card use by customers attracted to the accompanying rewards, burdening merchants with more interchange fees with no concomitant benefit.

110.    In a truly competitive market, where merchants are not required to accept all Visa cards or all MasterCard cards, a merchant could refuse to accept high-cost cards, such as premium cards, issued by particular banks. This freedom would spur Defendants' networks to lower interchange fees for these cards. Failing to do so would mean losing sales as consumers migrated to lower-cost accepted cards. It would also lead individual issuing banks to reduce interchange fees to avoid having their cards declined by merchants.

111.    Because the Honor-All-Cards Rules proscribe such competition, however, neither networks nor issuers have any incentive to cut the price of accepting expensive cards. Issuers do not fear losing business to a lower-cost issuer because merchants have no ability to turn down

- 28 -

any cards, regardless of price. As a result, the "default" interchange fees are locked in. Plaintiffs face the Hobson's choice of paying supracompetitive fees or taking the financially harmful step of refusing all of a network's payment cards.

### b. The "No-Multi-Issuer" Rules.

112.    The No-Multi-Issuer Rules have prohibited Visa or MasterCard member banks from issuing payment cards capable of processing a transaction routed over another card network. In other words, the banks cannot issue a card that can process either a Visa transaction or a MasterCard transaction. The result, as Defendants intended, is that merchants are unable to route a given transaction over whichever network would assess the lowest interchange fee. But for the No-Multi-Issuer Rules, consumers would demand, and Defendants' issuing banks would issue, payment cards capable of being processed by more than one network. The member banks would then compete on the price for merchant acceptance – *i.e.*, the interchange rate – to encourage merchants to steer customers to cards carrying the lowest interchange fees.

### c. The "All-Outlets" Rule.

113.    Defendants' All-Outlets Rules have required merchants who accept Visa or MasterCard payment cards at any of their locations to accept them at all of their locations – even if they operated under different trade names or followed different business models. The rules precluded merchants from gaining the benefits of competition by issuing banks as to the terms of acceptance by banner or by locations within a banner.

114.    Without the All-Outlets Rules, thrift or low-cost retailers owned by businesses that also own standard-price retailers would be able to selectively decline Defendants' cards at its discount outlets unless the issuing bank lowered its interchange rate. Competition for merchant acceptance at those locations would then drive down their interchange fees.

- 29 -

### d.  The "No-Discount" Rule.

115.    The No-Discount Rules have prohibited merchants from granting certain discounts to their customers. The Visa version of the rule prohibits (1) granting a discount to any consumer for using a non-Visa payment card, and (2) granting any consumer a discount for using a Visa payment card issued by one of its member banks without also offering the same discount to consumers who use a Visa payment card issued by any other member bank. MasterCard's version operates in the same way, banning discounts to customers for using a non-MasterCard payment card or a card issued by any particular MasterCard issuing bank.

116.    The rules have therefore precluded a merchant from using discounts to encourage consumer use of payment cards carrying lower interchange fees, whether the card is issued inside or outside Defendants' networks. Stated differently, the rules have forced merchants to accept higher-cost payment cards, even though they have received no additional benefit for doing so.

117.    On July 20, 2011, as part of the resolution of a civil action brought against them (and American Express) by the United States Department of Justice, Defendants removed the No-Discount Rules from their standard merchant agreements, altering them to allow merchants to (among other things) offer a customer an immediate discount for paying with a different payment card and to inform their customers about Defendants' transaction fees.

### e.  The "No-Surcharge" Rule.

118.    The No-Surcharge Rules also prohibited merchants from using selective pricing to attract the use of payment cards with lower interchange fees. The rules operated conversely to the No-Discount Rules, banning the use of surcharges on more expensive cards. They prohibited merchants from charging more to a consumer who used a card carrying a higher interchange fee. For example, Defendants barred merchants from surcharging cardholders who use their higher-priced premium credit card rather than their lower-priced standard card.

119.    The No-Surcharge Rules eliminated any incentive for Defendants or their issuing banks to drop their interchange fees because the decrease would not be visible to consumers and thus would not result in higher usage by consumers and the increased transactional volume that would come with it. Without these rules, Defendants' networks would lower their interchange fees to a competitive level to avoid being targeted by surcharges and losing transactional volume. The surcharge would have deflected customers from cards carrying higher interchange fees to those with lower ones, exerting downward pressure on interchange fees.

120.    The rule gave Visa and MasterCard an incentive to encourage use of the payment cards carrying the highest interchange fees rather than the most cost-efficient cards, or other payment methods. Under competitive conditions, it would have been contrary to the economic interest of each member bank to prevent merchants from surcharging the payment cards of other members.

121.    In sum, the Merchant Restraints have accomplished three of Defendants' anticompetitive objectives, all buttressing their framework of swollen interchange fees. First, they compel merchants to charge the same price for goods or services, regardless of a consumer's payment method. Second, they prevent merchants from steering consumers to cheaper payment options. And third, they increase the number of payment card transactions, which multiplies interchange fees, and ultimately interest income, for issuers.

## F.    The Harmful Effects of Defendants' Unlawful Restraints

122.    Visa and MasterCard have used their market power to impose "default" interchange fees and the Merchant Restraints on Plaintiffs and other merchants. Defendants' conspiracies have fixed interchange fees, insulated those fees from competitive forces, and perverted competition between payment methods in favor of products with the highest interchange fees.

- 31 -

123.    The Merchant Restraints have deprived Plaintiffs of the benefits of competition as to the terms of acceptance, including lower interchange fees charged by individual issuing banks. The Merchant Restraints have given issuing banks a mechanism to avoid competing for acceptance. Absent the supracompetitive "default" interchange fees and the Merchant Restraints, Plaintiffs would have been able to gain the benefits of competition as to interchange fees, which would have reduced them to a truly competitive level.

124.    Each of the Plaintiffs has been harmed by the actions of the Visa and MasterCard combinations. The amount of interchange fees paid by each Plaintiff during the Relevant Time Period was supracompetitive. Had the Merchant Restraints not existed, competition in the relevant market would have led to lower interchange fees. Each of the Plaintiffs would have had the chance to use the strategies it uses in other aspects of its business to secure competitive acceptance terms. The Merchant Restraints have denied them that opportunity.

125.    The Merchant Restraints are naked restraints on trade. They have not been necessary to advance any legitimate business purposes of Defendants' combinations and have had no procompetitive justifications. Defendants' networks would have been perfectly able to function effectively and efficiently with competitive interchange fees. Moreover, to achieve any legitimate objective of Defendants' networks there are alternative means that would not harm competition.

126.    Without the agreement of the other issuing banks to do the same, it would be contrary to the independent self-interest of any issuing bank to adhere to the Merchant Restraints. But for Defendants' anticompetitive conduct, each member bank would have pursued its own self-interest by competing for merchant acceptance of the payment cards they issue, because each should be an autonomous economic actor pursuing individual economic interests.

127.    Instead, the member banks have abnegated their independence, ceding to Visa and MasterCard the power to dictate the terms upon which the banks will allow merchants to accept their cards. By their resolute allegiance to the Merchant Restraints and "default" interchange fees, member banks have rid the marketplace of independent forces, nullifying competition among them with respect to the terms of merchant acceptance. Under these circumstances, prices and output are set at monopolistic levels by a cartel of banks rather than by healthy factors such as cost and consumer preferences.

128.    Each Plaintiff has been harmed by the actions of the Visa and MasterCard combinations. The interchange fees paid by each Plaintiff are supracompetitive. Absent the "default" interchange fees and the Merchant Restraints, Plaintiffs would be able to gain the benefits of competition as to interchange fees. The fees would then drop to a competitive level.

**G.    Legislation and Litigation Fail to Curtail Anticompetitive Conduct**

129.    Over the past decade, judicial efforts to curb the exercise of market power by the Visa and MasterCard combinations have been largely ineffective. The changes that were made to the Merchant Restraints because of the settlement of the Visa Check litigation and the federal government's enforcement actions against the networks (including *U.S. v. Visa* in the early 2000s and the *U.S. v. American Express*, *et al*. case brought in 2010) did not eliminate the market power of the Visa and MasterCard combinations, and did not curtail the levels of, or increases in, interchange fees being paid by merchants.

130.    In 2003, the so-called "exclusivity" rules of both Defendants' combinations, which prohibited member banks from issuing payment cards on competing American Express or Discover networks, were declared unlawful. In that same year, in a class action settlement, Visa and MasterCard agreed to cease using the Honor-All-Cards Rules to tie credit card acceptance and debit card acceptance. These actions did not diminish Visa's and MasterCard's power to

- 33 -

dictate price and prevent competition. Immediately after those actions, both combinations increased the credit interchange fees exacted from merchants and the Federal Reserve Board subsequently found the debit interchange fees imposed by Visa and MasterCard after these court rulings to be significantly above cost.

## VI.    CLAIMS FOR RELIEF

### COUNT I

### VISA'S PER SE UNLAWFUL PRICE-FIXING OF INTERCHANGE FEES FOR ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 1)

131.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 130 above.

132.    The provision of network services associated with the use of credit cards issued by members of Visa's network and the rules governing the provision of network services associated with the use of Visa credit cards have occurred in and had a substantial anticompetitive effect on interstate commerce.

133.    Visa and its co-conspirator member banks are a combination within the meaning of section 1 of the Sherman Act. They have entered into and engaged in a continuing horizontal combination and conspiracy to fix, increase, and maintain interchange fees charged to Plaintiffs for acceptance of credit cards in the United States, both before and after Visa's reorganization and IPO, in violation of section 1 of the Sherman Act.

134.    The course, pattern and practice of Visa's conduct have included, among other things, a continuing agreement, understanding and concert of action among Visa and its member banks, the substantial terms, purpose and effect of which have been to refrain from competing on the setting of interchange fees charged to Plaintiffs for accepting Visa credit cards.

135.     In order to organize and effectuate its illegal combination and conspiracy, Visa and its member banks have engaged in a number of overtly collusive acts, including without limitation:

a.     Agreeing to exchange and exchanging current and future price information about interchange fees to charge Plaintiffs;

b.     Agreeing to coordinate and coordinating the interchange fees they would charge Plaintiffs;

c.     Agreeing on the rates of interchange fees to charge Plaintiffs;

d.     Agreeing to fix, increase and maintain, and fixing, increasing and maintaining interchange fees charged to Plaintiffs;

e.     Charging interchange fees to Plaintiffs in accordance with their agreements;

f.     Enforcing their agreements by measures including without limitation the imposition of fines for the failure to adhere to the interchange fees agreed on;

g.     Participating in conversations and meetings to discuss what interchange fees to charge Plaintiffs;

h.     Issuing interchange fee announcements and quotes; and

i.     Exchanging with each other information regarding interchange fees and other business information that in a competitive environment would be deemed commercially sensitive and withheld from competitors.

136.     As part of their unlawful collusion with Visa, each of its member banks has knowingly, intentionally and actively participated in the unlawful conspiracy as business entities distinct from Visa.

137.    As a result of the unlawful collusion by Visa and its member banks, interchange fees for credit transactions have been fixed, increased and maintained at artificially high, noncompetitive levels in the United States, depriving Plaintiffs of the benefit of free and open competition in the setting of interchange fees.

138.    Plaintiffs have been injured in their business or property in the relevant market as a direct result of the horizontal conspiracy operated by Visa and its member banks. These injuries are of the type that the antitrust laws were designed to prevent.

139.    To the extent, if any, that Visa's antitrust violations have not ceased pursuant to the Class Settlement or otherwise, its unlawful conduct threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT II

### MASTERCARD'S PER SE UNLAWFUL PRICE-FIXING OF INTERCHANGE FEES FOR ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 1)

140.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 139 above.

141.    The provision of network services associated with the use of credit cards issued by members of MasterCard's network and the rules governing the provision of network services associated with the use of MasterCard credit cards have occurred in and had a substantial anticompetitive effect on interstate commerce.

142.    MasterCard and its co-conspirator member banks are a combination within the meaning of section 1 of the Sherman Act. They have entered into and engaged in a continuing horizontal combination and conspiracy to fix, increase, and maintain interchange fees charged to Plaintiffs for acceptance of credit cards in the United States, both before and after MasterCard's reorganization and IPO, in violation of section 1 of the Sherman Act.

- 36 -

143.    The course, pattern and practice of MasterCard's conduct have included, among other things, a continuing agreement, understanding and concert of action among MasterCard and its member banks, the substantial terms, purpose and effect of which have been to refrain from competing on the setting of interchange fees charged to Plaintiffs for accepting MasterCard credit cards.

144.    In order to organize and effectuate its illegal combination and conspiracy, MasterCard and its member banks engaged in a number of overtly collusive acts, including without limitation:

a.    Agreeing to exchange and exchanging current and future price information about interchange fees to charge Plaintiffs;

b.    Agreeing to coordinate and coordinating the interchange fees they would charge Plaintiffs;

c.    Agreeing on the rates of interchange fees to charge Plaintiffs;

d.    Agreeing to fix, increase and maintain, and fixing, increasing and maintaining interchange fees charged to Plaintiffs;

e.    Charging interchange fees to Plaintiffs in accordance with their agreements;

f.    Enforcing their agreements by measures including without limitation the imposition of fines for the failure to adhere to the interchange fees agreed on;

g.    Participating in conversations and meetings to discuss what interchange fees to charge Plaintiffs;

h.    Issuing interchange fee announcements and quotes; and

- 37 -

i.      Exchanging with each other information regarding interchange fees and other business information that in a competitive environment would be deemed commercially sensitive and withheld from competitors.

145.    As part of their unlawful collusion with MasterCard, each of its member banks has knowingly, intentionally and actively participated in the unlawful conspiracy as business entities distinct from MasterCard.

146.    As a result of the unlawful collusion by MasterCard and its member banks, interchange fees for credit transactions have been fixed, increased and maintained at artificially high, noncompetitive levels in the United States, depriving Plaintiffs of the benefit of free and open competition in the setting of interchange fees.

147.    Plaintiffs have been injured in their business or property in the relevant market as a direct result of the horizontal conspiracy operated by MasterCard and its member banks. These injuries are of the type that the antitrust laws were designed to prevent.

148.    To the extent, if any, that MasterCard's antitrust violations have not ceased pursuant to the Class Settlement or otherwise, its unlawful conduct threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

**COUNT III**

**VISA'S UNLAWFUL COMPETITIVE RESTRAINTS ON
ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 1)**

149.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 148 above.

150.    The provision of network services associated with the use of credit cards issued by members of Visa's network and the operation of Visa's Merchant Restraints, which control

- 38 -

the provision of network services associated with the use of those credit cards, have occurred in and had a substantial anticompetitive effect on interstate commerce.

151.     Visa and its member banks are a combination within the meaning of section 1 of the Sherman Act, and the Merchant Restraints implemented by Visa and its member banks have constituted horizontal agreements within the meaning of section 1 of the Sherman Act. Both before and after its reorganization and IPO, Visa has facilitated these conspiracies by managing the combination and operation of the Merchant Restraints, with the purpose and effect of restricting competition for interchange fees.

152.     Individually and in combination, the Merchant Restraints have constituted an illegal horizontal agreement to fix interchange fees and to suppress competition for interchange fees, in violation of section 1 of the Sherman Act.

153.     The Merchant Restraints have had the intended effects of fixing interchange fees and eliminating competition by preventing merchants from gaining the benefits of competition as to the interchange fees paid to issuing banks.

154.     As part of their unlawful collusion with Visa, each of its member banks has knowingly, intentionally and actively participated in the unlawful conspiracy as business entities distinct from Visa.

155.     As a result of the unlawful collusion by Visa and its member banks, including the adoption and enforcement of the Merchant Restraints, interchange fees have been fixed, increased and maintained at artificially high, noncompetitive levels in the United States, depriving Plaintiffs of the benefit of free and open competition in the setting of interchange fees.

156.     Plaintiffs have been injured in their business or property as a direct result of the horizontal conspiracy operated by Visa and its member banks in the relevant market. These injuries are of the type that the antitrust laws were designed to prevent.

157.     To the extent, if any, that Visa's antitrust violations have not ceased pursuant to the Class Settlement or otherwise, its unlawful conduct threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT IV

## MASTERCARD'S UNLAWFUL COMPETITIVE RESTRAINTS ON ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 1)

158.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 157 above.

159.     The provision of network services associated with the use of credit cards issued by members of MasterCard's network and the operation of MasterCard's Merchant Restraints, which control the provision of network services associated with the use of those credit cards, have occurred in and had a substantial anticompetitive effect on interstate commerce.

160.     MasterCard and its member banks are a combination within the meaning of section 1 of the Sherman Act, and the Merchant Restraints implemented by MasterCard and its member banks constitute horizontal agreements within the meaning of section 1 of the Sherman Act. Both before and after its reorganization and IPO, MasterCard has facilitated these conspiracies by managing the combination and operation of the Merchant Restraints, with the purpose and effect of restricting competition in the relevant market.

161.     Individually and in combination, the Merchant Restraints have constituted an illegal horizontal agreement to fix interchange fees and to suppress competition for interchange fees, in violation of section 1 of the Sherman Act.

162.     The Merchant Restraints have had the intended effects of fixing the price of network services and eliminating competition by preventing merchants from gaining the benefits of competition as to the interchange fees paid to issuing banks.

163.     As part of their unlawful collusion with MasterCard, each of its member banks has knowingly, intentionally and actively participated in the unlawful conspiracy as business entities distinct from MasterCard.

164.     As a result of the unlawful collusion by MasterCard and its member banks, including the adoption and enforcement of the Merchant Restraints, interchange fees have been fixed, increased and maintained at artificially high, noncompetitive levels in the United States, depriving Plaintiffs of the benefit of free and open competition in the setting of interchange fees.

165.     Plaintiffs have been injured in their business or property as a direct result of the horizontal conspiracy operated by MasterCard and its member banks in the relevant market. These injuries are of the type that the antitrust laws were designed to prevent.

166.     To the extent, if any, that MasterCard's antitrust violations have not ceased pursuant to the Class Settlement or otherwise, its unlawful conduct threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT V

### VISA'S MONOPOLIZATION OF THE MARKET FOR ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 2)

167.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 166 above.

168.     The provision of network services associated with the use of credit cards issued by members of Visa's network and Visa's monopolization of the market for network services have occurred in and had a substantial anticompetitive effect on interstate commerce.

- 41 -

169.     Visa has willfully acquired, possessed and maintained monopoly power in the relevant market.

170.     Visa has abused its monopoly power by, among other things, imposing on Plaintiffs the Merchant Restraints, which have had the purpose and effect of excluding competition from, and limiting the competitive opportunities of other sellers in, the relevant market. The rules and restraints imposed by Visa have made it difficult or impossible for other card networks and providers to enter the market.

171.     Visa's acquisition and exercise of monopoly power has violated, and if not enjoined, will continue to violate, section 2 of the Sherman Act.

172.     As a direct and proximate result of Visa's monopolistic, exclusionary and anticompetitive conduct, interchange fees have risen to and remain at artificial, supracompetitive levels. Plaintiffs have suffered injury to their business or property by having to pay artificially inflated, supracompetitive interchange fees for accepting credit cards. Plaintiffs' injuries are of the type that the antitrust laws were designed to prevent.

173.     To the extent, if any, that Visa's antitrust violations have not ceased pursuant to the Class Settlement or otherwise, its unlawful conduct threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT VI

### MASTERCARD'S MONOPOLIZATION OF THE MARKET FOR ACCEPTANCE OF CREDIT CARDS (SHERMAN ACT § 2)

174.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 173 above.

010237-28  770504 V1

175.    The provision of network services associated with the use of credit cards issued by members of MasterCard's network and MasterCard's monopolization of the relevant market have occurred in and had a substantial anticompetitive effect on interstate commerce.

176.    MasterCard has willfully acquired, possessed and maintained monopoly power in the relevant market.

177.    MasterCard has abused its monopoly power by, among other things, imposing on Plaintiffs the Merchant Restraints, which have had the purpose and effect of excluding competition from, and limiting the competitive opportunities of other sellers in, the relevant market. The rules and restraints imposed by MasterCard have made it difficult or impossible for other card networks and providers to enter the market.

178.    MasterCard's acquisition and exercise of monopoly power has violated, and if not enjoined, will continue to violate, section 2 of the Sherman Act.

179.    As a direct and proximate result of MasterCard's monopolistic, exclusionary and anticompetitive conduct, interchange fees have risen to and remain at artificial, supracompetitive levels. Plaintiffs have suffered injury to their business or property by having to pay artificially inflated, supracompetitive interchange fees for accepting credit cards. Plaintiffs' injuries are of the type that the antitrust laws were designed to prevent.

180.    To the extent, if any, that MasterCard's antitrust violations have not ceased pursuant to the Class Settlement or otherwise, its unlawful conduct threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT VII

## VISA'S ATTEMPTED MONOPOLIZATION (SHERMAN ACT § 2)

181.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 180 above.

- 43 -

182.    Visa's anticompetitive conduct has created a dangerous probability that Visa will achieve monopoly power in the relevant market.

183.    Visa has a specific intent to achieve monopoly power in the relevant market.

184.    Visa has used its market power to impose on Plaintiffs and other retail merchants' restraints and restrictions that have the purpose and effect of excluding competition from and limiting the competitive opportunities of other sellers in the relevant market. These restraints and restrictions include, but are not limited to, the Merchant Restraints. The regulations and restrictions imposed by Visa make it difficult or impossible for other card networks and providers to enter the relevant market or increase the usage of their cards by offering lower interchange fees or other attractive terms to retail merchants like Plaintiffs.

185.    As a direct and proximate result of Visa's exclusionary conduct, interchange fees have been set at artificial, supracompetitive levels and Plaintiffs have suffered and will suffer injuries to their business or property by having to pay such artificially inflated, supracompetitive interchange fees for network services. Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

**COUNT VIII**

**MASTERCARD'S ATTEMPTED MONOPOLIZATION (SHERMAN ACT § 2)**

186.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 185 above.

187.    MasterCard's anticompetitive conduct has created a dangerous probability that MasterCard will achieve monopoly power in the relevant market.

188.    MasterCard has a specific intent to achieve monopoly power in the relevant market.

- 44 -

189.    MasterCard has used its market power to impose on Plaintiffs and other retail merchant's restraints and restrictions that have the purpose and effect of excluding competition from and limiting the competitive opportunities of other sellers in the relevant market. These restraints and restrictions include, but are not limited to, the Merchant Restraints. The restraints and restrictions imposed by MasterCard make it difficult or impossible for other card networks and providers to enter the relevant market or increase the usage of their cards by offering lower interchange fees or other attractive terms to retail merchants like Plaintiffs.

190.    As a direct and proximate result of MasterCard's exclusionary conduct, interchange fees have been set at artificial, supracompetitive levels and Plaintiffs have suffered and will suffer injuries to their business or property by having to pay such artificially inflated, supracompetitive interchange fees for Network Services. Plaintiffs' injuries are the type of injuries the antitrust laws were designed to prevent and flow from that which makes MasterCard's conduct unlawful.

## COUNT IX

## VISA'S VIOLATIONS OF STATE ANTITRUST AND UNFAIR COMPETITION LAWS

191.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 190 above.

192.    Plaintiffs allege they are direct purchasers as defined by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In the event the Court were to find otherwise, however, the following causes of action under state antitrust and unfair competition laws, which permit indirect purchaser actions, are asserted in the alternative.

193.    Visa has violated California Business and Professions Code § 16700, *et seq*. The alleged illegal agreements, combinations and conspiracies entered into between Visa and its member banks were designed and implemented from Visa's offices in California, and a

- 45 -

significant amount of the conspiratorial conduct among Visa and its member banks took place in California. Further, Visa's development, promulgation and imposition of the Merchant Restraints and its monopolistic practices were performed and conducted from its offices in California. Thus, California has a strong interest in the application of its antitrust and unfair competition laws in this case. Further, application of California's antitrust and unfair competition laws in this case is consistent with due process.

194.    By reason of the foregoing, Visa has also violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, *et seq.* The Defendants' acts and/or practices are deceptive within the meaning of UCL § 17200. The alleged illegal agreements, combinations and/or conspiracies entered into between Visa and its member banks were formulated and implemented from Visa's offices in California and a significant amount of the conspiratorial conduct among Visa and its member banks took place in California. Further, Visa's development, promulgation and imposition of the Merchant Restraints, and its monopolistic practices alleged herein, were performed and conducted from its offices in California. Thus, California has a strong interest in the application of its antitrust and unfair competition laws in this case. Further, application of California's antitrust and unfair competition laws is consistent with due process.

195.    In the event that the Court does not apply California antitrust and unfair competition law to Plaintiffs' claims, Plaintiffs allege the following violations of state consumer protection and unfair competition laws in the alternative. Plaintiffs accept payment cards in connection with payment for goods or services in each of the states below, have paid supracompetitive Interchange Fees in each of the states below, and Visa engaged in unfair

competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of

the state consumer protection and unfair competition statutes listed below.

a. Alabama: By reason of the foregoing, Visa has violated Alabama Code § 8-10-1, *et seq.*

b. Arkansas: By reason of the foregoing, Visa has violated Arkansas' laws by engaging in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Ark. St. §§ 4-88-101, *et seq.*

c. Florida: By reason of the foregoing, Visa has violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

d. Iowa: By reason of the foregoing, Visa has violated Iowa Code §§ 553.1, *et seq.*

e. Kansas: By reason of the foregoing, Visa has violated Kansas Statutes Annotated, §§ 50- 01, *et seq.*

f. Michigan: By reason of the foregoing, Visa has violated Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

g. Minnesota: By reason of the foregoing, Visa has violated the Minnesota Antitrust Act, Minn. Stat. §§ 325D.49 - 325D.66.

h. Mississippi: By reason of the foregoing, Visa has violated Mississippi Code Annotated §§ 75-21-1, *et seq.*

i. Missouri: By reason of the foregoing, Visa has violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020.

j. New Mexico: By reason of the foregoing, Visa has violated New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

k. New York: By reason of the foregoing, Visa has violated New York's General Business Law, N.Y. Gen. Bus. Law §§ 340, *et seq.*

l. North Carolina: By reason of the foregoing, Visa has violated North Carolina General Statutes §§ 75-1, *et seq.*

m. North Dakota: By reason of the foregoing, Visa has violated North Dakota Century Code §§ 51-08.1-01, *et seq.*

n. South Dakota: By reason of the foregoing, Visa has violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

o. Tennessee: By reason of the foregoing, Visa has violated Tennessee Code Annotated §§ 47-25-101, *et seq.*

p. West Virginia: By reason of the foregoing, Visa has violated West Virginia Code §§ 47-18-1, *et seq.*

q.      Wisconsin: By reason of the foregoing, Visa has violated Wisconsin Statutes §§ 133.01, *et seq*.

196.    As a direct and proximate result of Visa's unlawful conduct, Plaintiffs have been injured in their businesses and property by paying supracompetitive interchange fees.

## COUNT X

### MASTERCARD'S VIOLATIONS OF STATE ANTITRUST AND UNFAIR COMPETITION LAWS

197.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 196 above.

198.    Plaintiffs allege they are direct purchasers as defined by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In the event the Court were to find otherwise, however, the following causes of action under state antitrust and unfair competition laws, which permit indirect purchaser actions, are asserted in the alternative.

199.    By reason of the foregoing, MasterCard has violated New York General Business Law § 340, *et seq.* The alleged illegal agreements, combinations and/or conspiracies entered into between MasterCard and its member banks were designed and implemented from MasterCard's offices in New York and a significant amount of the conspiratorial conduct among MasterCard and its member banks took place in New York. Further, MasterCard's development, promulgation and imposition of the Merchant Restraints and its monopolistic practices were performed and conducted from its offices in New York. Thus, New York has a strong interest in the application of its antitrust and unfair competition laws in this case. Further, application of New York's antitrust and unfair competition laws in this case is consistent with due process.

200.    In the event that the Court does not apply New York antitrust and unfair competition law to Plaintiffs' claims, Plaintiffs allege the following violations of state consumer protection and unfair competition laws in the alternative. Plaintiffs accept payment cards in

- 48 -

connection with payment for goods or services in each of the states below, have paid

supracompetitive interchange fees in each of the states below, and defendants engaged in unfair

competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of

the state consumer protection and unfair competition statutes listed below.

a.     Alabama: By reason of the foregoing, Visa has violated Alabama Code §§ 8-10-1, *et seq.*

b.     Arkansas: By reason of the foregoing, Visa has violated Arkansas' laws by engaging in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of Ark. St. §§ 4-88-101, *et seq.*

c.     Florida: By reason of the foregoing, Visa has violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

d.     Iowa: By reason of the foregoing, Visa has violated Iowa Code §§ 553.1, *et seq.*

e.     Kansas: By reason of the foregoing, Visa has violated Kansas Statutes Annotated, §§ 50- 01, *et seq.*

f.     Michigan: By reason of the foregoing, Visa has violated Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

g.     Minnesota: By reason of the foregoing, Visa has violated the Minnesota Antitrust Act, Minn. Stat. §§ 325D.49 - 325D.66.

h.     Mississippi: By reason of the foregoing, Visa has violated Mississippi Code Annotated §§ 75-21-1, *et seq.*

i.     Missouri: By reason of the foregoing, Visa has violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020.

j.     New Mexico: By reason of the foregoing, Visa has violated New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

k.     North Carolina: By reason of the foregoing, Visa has violated North Carolina General Statutes §§ 75-1, *et seq.*

l.     North Dakota: By reason of the foregoing, Visa has violated North Dakota Century Code §§ 51-08.1-01, *et seq.*

m.     South Dakota: By reason of the foregoing, Visa has violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

n.     Tennessee: By reason of the foregoing, Visa has violated Tennessee Code Annotated §§ 47-25-101, *et seq.*

010237-28  770504 V1

o.   West Virginia: By reason of the foregoing, Visa has violated West Virginia Code §§ 47-18-1, *et seq.*

p.   Wisconsin: By reason of the foregoing, Visa has violated Wisconsin Statutes §§ 133.01, *et seq.*

201.   As a direct and proximate result of MasterCard's unlawful conduct, Plaintiffs have been injured in their businesses and property by paying supracompetitive interchange fees.

## DEMAND FOR JURY TRIAL

202.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all disputed issues of fact in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Awarding to each Plaintiff from each Defendant an amount to be determined at trial, including, but not limited to, compensatory damages, trebled damages, and prejudgment and post-judgment interest as permitted by law;

B.   Enjoining each of the Defendants from engaging in any conduct in violation of the Sherman Act or state antitrust or unfair competition laws persisting after the Class Settlement and requiring them to take affirmative steps to dissipate the effects of their prior violations;

C.   Awarding the cost of this action, including reasonable attorneys' fees; and

D.   Granting such other relief that the Court may deem just and proper.

010237-28  770504 V1

Dated: March 27, 2015                    **HAGENS BERMAN SOBOL SHAPIRO LLP**


                                        By: s/Jason A. Zweig
                                            Jason A. Zweig (JZ-8107)
                                        555 Fifth Avenue, Suite 1700
                                        New York, NY  10017
                                        Tel: (212) 856-7227
                                        Fax: (917) 210-3980
                                        jasonz@hbsslaw.com

                                        Vincent J. Esades
                                        Dylan J. McFarland
                                        **HEINS MILLS & OLSON, P.L.C.**
                                        310 Clifton Avenue
                                        Minneapolis, MN  55403
                                        Tel: (612) 338-4605
                                        Fax: (612) 338-4692
                                        vesades@heinsmills.com
                                        dmcfarland@heinsmills.com

                                        *Attorneys for Plaintiffs*

010237-28  770504 V1